IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | | |
|---|---|---|
| Stephon L. Hopkins, | ) | Case No.: 6:21-cv-00553-JD-JDA |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | **ORDER AND OPINION** |
| Jacob A. Walters, *Officer*; Austin Fowler, | ) | |
| *Officer*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

This matter is before the Court with the Report and Recommendation ("Report and Recommendation" or "Report") of United States Magistrate Judge Jacquelyn D. Austin, made in accordance with 28 U.S.C. § 636(b)(1)(B) and Local Civil Rule 73.02(B)(2) of the District of South Carolina.[1] (DE 68.) Plaintiff Stephon L. Hopkins ("Plaintiff" or "Hopkins") brought this action against defendants Officer Jacob A. Walters ("Walters") and Officer Austin Fowler ("Fowler") (collectively "Defendants"), alleging Fourth and Fourteenth Amendment civil rights violations arising out of claims for unlawful seizure of his person, excessive force, and cruel and unusual punishment. (DE 22.) On April 2, 2022, Defendants filed a Motion for Summary Judgment seeking to dismiss Hopkins's claims. (DE 60.) On May 20, 2022, Hopkins filed a response Memorandum in Opposition to Defendants' Motion for Summary Judgment. (DE 64.) On May 27, 2022, Defendants filed a reply. (DE 66.)

---

[1]    The recommendation has no presumptive weight, and the responsibility for making a final determination remains with the United States District Court. See Mathews v. Weber, 423 U.S. 261, 270-71 (1976). The court is charged with making a de novo determination of those portions of the Report and Recommendation to which specific objection is made. The court may accept, reject, or modify, in whole or in part, the recommendation made by the magistrate judge or recommit the matter with instructions. 28 U.S.C. § 636(b)(1).

On August 23, 2022, the magistrate judge issued the Report, recommending that the motion be granted on Counts I (unreasonable seizure) and III (cruel and unusual punishment); granted on Count II (excessive force) to the extent it is based on the force applied at the residence and to the extent the claim is asserted against Fowler regarding the car-door incident; and denied on Count II to the extent the claim is based on the use of force applied in the wooded area and to the extent it is asserted against Walters regarding the car-door incident.  (DE 68.)  For the reasons stated below, the Court adopts the Report and grants Defendants' Motion for Summary Judgment, in part, and denies it in part as provided herein.  (DE 50.)

## BACKGROUND

The Report and Recommendation sets forth the relevant facts and legal standards, which the Court incorporates herein without a full recitation.  However, as a brief background relating to the objections raised by Plaintiff, the Court provides this summary.

On April 22, 2019, Greenville County Sheriff Deputies Walters and Fowler each responded separately to a residence in reference to two 911 hang-up calls.  (DE 64-2, p. 3.)  Dispatch advised that on one of the calls a female provided the address and hung up and, on a second call, dispatchers could hear a disturbance in the background before the caller hung up again.  (Id.)  Walters and Fowler arrived at the scene at the same time and found Rosa Brannon ("Brannon") standing outside by the road in front of the residence, smoking a cigarette.  (Id.)  The officers did not notice any visible injuries on Brannon.  (DE 64-1, p. 6, 9.)  As may be seen in body cam footage, Brannon denied calling 911 and stated that she lived in the residence ("Residence") with her daughter but no one else was in the residence.

As Fowler walked towards a neighboring residence, Walters continued to question Brannon, who repeated that she had not called 911 and stated that no one else was inside the home.

Fowler asked a woman in the neighbor's front yard if she had called 911, and she said she had not and that there had been an argument in front of Brannon's residence.  With that information, Fowler returned to the Residence and asked if the officers could look inside the house, to which Brannon answered, "Isn't nobody going in my house. Nuh-uh."  Walters told Brannon that they received two 911 calls from this house, and they had to make sure that no one was inside and hurt. Brannon repeated that no one was inside.  Walters asked Brannon if she had her identification with her.  She walked toward a car under a carport attached to the Residence, opened the car door, and retrieved her identification.  Walters heard a noise from inside the house and asked Brannon who was home. Walters knocked on the door, and Plaintiff immediately opened the door and said, "Hey, how you doing?"  Hopkins then looked at Brannon and said, "I know you cheatin' on me; I know you cheatin'."  Walters told him, "Hold on. Hold on."  As Plaintiff stepped down from the doorway into the carport, he rotated to the left, faced Brannon—who was only a few feet away—and continued to repeat through the screen door, which Walters was still holding, "I know you cheatin' on me." Walters again said, "Hold on."

As Walters said this, Fowler asked Brannon to walk out to the carport, away from Plaintiff, which she did.  With Walters continuing to hold the screen door, blocking Plaintiff's path out to the carport, Plaintiff said, "'Scuse me, sir. 'Scuse me. […] I just want to leave. […]."  Walters then let go of the screen door and thus was no longer blocking Plaintiff's path out to the carport. However, Walters then told Plaintiff, "Come out here for a minute," pointing outside of the carport in the direction of the road in front of the Residence.  Plaintiff said, "I'm gone, man," and walked toward the front of the carport. Walters said, "Alright, hold on."  At that point, Plaintiff, who had been walking beside the car, turned right and walked in front of the car.  When he cleared the car,

he turned right again and walked beside the house toward the back yard. Walters, walking behind him, told him four more times, "Come here."

As Plaintiff approached the backyard, Walters reached out and attempted to grab Plaintiff around his right shoulder. Plaintiff attempted to pull away and yelled for Walters to get off of him as the two men struggled. Walters held on to the top of Plaintiff's sweatshirt, pulling it over the back of Plaintiff's head and pulled Plaintiff's head toward the ground. As soon as the struggle began, Fowler ran toward the men and grabbed Plaintiff from behind. The struggle continued as Plaintiff and Fowler fell to the ground. As the officers continued to wrestle with Plaintiff, Walters repeatedly demanded that Plaintiff put his hands behind his back, but Plaintiff tucked his arms underneath him and refused to give the officers his hands. During the struggle, Fowler's and Walters' body cams fell off onto the ground, although they continued to record. From the recordings, one can hear Plaintiff repeatedly saying that he is trying to leave and can hear Walters telling Plaintiff that he is going to get tased.

Documentation and testimony show that Walters eventually did tase Plaintiff multiple times as they wrestled with him. (DE 60-7, pp. 12-15; 64-2, p. 4; 64-5, pp. 19-22.) Plaintiff was able to stand up and started running through the back yard. (DE 60-7, pp. 16-17; 64-2, pp. 4, 8-9.) Walters called out over the radio that they were chasing Plaintiff on foot. (DE 64-2, pp. 4, 9.) He also told Plaintiff at that point that he was under arrest. (Id. at p. 9.) As Plaintiff began to run, he still had taser prongs in his shoulder, but he broke the taser wires from the cartridge when he was able to achieve sufficient separation from the officers, and he pulled the prongs out of his shoulder as he ran and threw them to the ground. (Id. at pp. 4–5; 64-5, p. 9.) He proceeded across a road and into a patch of woods, then stopped when he came to a gate and "put [his] hands up." (DE 64-2, pp. 5, 9; 60-7, pp. 17-18.) Walters ran up to Plaintiff and punched him in the face. (DE

4

60-7, p. 18.)  A moment later, Fowler tackled Plaintiff and held him down as Walters repeatedly

punched him many more times, including in the face, jaw, head, and back, and Fowler tased him.

(Id. at pp. 17-21; 64-4.)  Fowler also testified that, during the struggle, Fowler attempted "three or

four" times to "drive stun" Plaintiff with his taser on the back of Plaintiff's thigh but that Plaintiff

did "not seem to experience any discomfort from that." (DE 64-3, p. 8.)  The officers subsequently

secured Plaintiff's arms and handcuffed him.  (DE 64-2, p. 5.)

Walters eventually transported Plaintiff to the Greenville County Detention Center ("the

Detention Center").  (DE 60-3, p. 20; 64-2, p. 6.)  When they arrived at the Detention Center,

Walters told Plaintiff that he intended to charge him at least with resisting arrest and interfering

with a police officer.  Walters exited the vehicle, walked around to the passenger side, opened the

vehicle's passenger-side back door, and positioned Plaintiff, who was still handcuffed and seated,

with his feet on the ground beside the car.  Plaintiff asked Walters to go get other officers because

Plaintiff "did not feel comfortable with" Walters.   (DE 60-7, p. 24.).  Plaintiff continued to

complain about Walters beating him with his handcuffs.  (DE 64-2, p. 6.)  Walters radioed for

some assistance and began attempting to take Plaintiff out of the vehicle.  As soon as Walters

touched Plaintiff, Plaintiff told Walters to get off of him, struggling and continuing to complain

about the earlier abuse.

Accordingly, Walters ended up dragging Plaintiff out of the vehicle feet first.  As Plaintiff

was sliding out, Plaintiff said, "Alright, I'm out your car," and he dropped to the ground, so that

he was on his left side, perpendicular to the vehicle, with the back of his head inches away from

the inside of the car and his head and face inches away from the open door.  Walters promptly

closed the car door on Plaintiff's head, causing the door to pop back open.  Showing no reaction

other than to smile, Walters then dragged Plaintiff's top half toward the back of the car and shut the car door successfully.  (DE 64-4, p. 21.)

## DISCUSSION

On September 6, 2022, Hopkins filed an objection to the Report.  (DE 69.)  However, to be actionable, objections to a report and recommendation must be specific.  Failure to file specific objections constitutes a waiver of a party's right to further judicial review, including appellate review, if the recommendation is accepted by the district judge.  See United States v. Schronce, 727 F.2d 91, 94 & n. 4 (4th Cir. 1984).  "The Supreme Court has expressly upheld the validity of such a waiver rule, explaining that 'the filing of objections to a magistrate's report enables the district judge to focus attention on those issues -- factual and legal -- that are at the heart of the parties' dispute.'"  Diamond v. Colonial Life & Accident Ins. Co., 416 F.3d 310, 315 (2005) (citing Thomas v. Arn, 474 U.S. 140 (1985)).  "A general objection to the entirety of the magistrate judge's report is tantamount to a failure to object."  Tyler v. Wates, 84 F. App'x 289, 290 (4th Cir. 2003).  "Likewise, a mere restatement of the arguments raised in the summary judgment filings does not constitute an 'objection' for the purposes of district court review."  Nichols v. Colvin, 100 F. Supp. 3d 487 (E.D. Va. 2015).  In the absence of specific objections to the Report and Recommendation of the magistrate judge, this court is not required to give any explanation for adopting the recommendation. See Camby v. Davis, 718 F.2d 198, 199 (4th Cir. 1983).

Upon review, the Court finds that Hopkins raises two objections to the Report:  1) failing to view the facts in a light most favorable to the Plaintiff; and 2) incorrectly determining that the use of force exerted against Hopkins at the Residence was reasonable.  (DE 69.)  The Court addresses both objections *seriatim*.

First, as to viewing the facts in a light most favorable to Plaintiff, Hopkins alleges, "at the time Defendants sought to ask Plaintiff questions, the 911 hang-up calls and a witness account that arguing was heard were not sufficient to support a reasonable suspicion that criminal activity was afoot." (DE 69, p. 7.) Hopkins further claims that the facts viewed in a light most favorable to him do not support Defendants' reasonable suspicion that Hopkins was involved in domestic violence. (Id.) This Court disagrees and is unpersuaded by Plaintiff's contention that "[a]t best, Defendants' only reasonable suspicion was that there was verbal dispute between two people." (DE 69, p. 7.) The Report states:

> The officers here had responded to two 911 hang-up calls. Dispatch had advised that a female had provided an address on the first call before hanging up and that on the second call, dispatch could hear a disturbance before the hang up. Brannon was outside waiting by the roadway when Defendants arrived, and she denied that anyone had called 911 or that anyone was in the home. Plaintiff subsequently emerged from the home, angrily stating that he had caught Brannon cheating on him with his own brother.

(DE 68, p. 17) (citations omitted.) See United States v. Perkins, 363 F.3d 317, 326 (4th Cir. 2004) ("[T]he very point of Terry was to permit officers to take preventive action and conduct investigative stops before crimes are committed, based on what they view as suspicious—albeit even legal—activity."); Tierney v. Davidson, 133 F.3d 189, 198 (2d Cir. 1998) ("The logical means to defuse the [possible ongoing domestic dispute] was to find the other person [involved] and ensure that he or she presented or was in no further danger."). Therefore, Defendants had reason to suspect that Hopkins was involved in criminal activity that was more than a verbal dispute between two people, and Plaintiff's objection is overruled.

As to Hopkins's excessive force at the residence argument, he contends there was no probable cause that Hopkins had committed a crime and there was no underlying offense to support a charge for resisting arrest, and therefore, the officers used excessive force in detaining him. (DE

7

69, p. 9.)  Again, the Report ably and comprehensively addressed this objection.  The Report points out that Plaintiff forecasted evidence that during the approximately 40-second struggle, Defendants attempted to grab him and they tackled him, choked him, and tased him.  (DE 68, p. 23.)  Further, the Report notes, "[c]ourts have held that use of a taser gun to subdue a belligerent suspect who has repeatedly ignored police instructions is not excessive force," Davis, 2014 WL 3805798, at *5, Report and Recommendation adopted in relevant part by 2014 WL 3805802, at *3 (D.S.C. July 30, 2014).  Further, Plaintiff has not forecasted any evidence indicating that Defendants employed force greater than was needed to accomplish the purpose of the stop, especially in light of the fact that the force the officers used at the Residence was indeed insufficient to bring Plaintiff under control.  (DE 68, p. 23.)

Accordingly, after a thorough review of the Report and Recommendation and the record in this case, the Court adopts the Report (DE 68) and incorporates it by reference.

It is, therefore, **ORDERED** that Defendant's Motion for Summary Judgment (DE 60) is granted, in part, and denied, in part, as provided herein.

**IT IS SO ORDERED**.

Joseph Dawson, III
United States District Judge

Florence, South Carolina
November 3, 2022

8